UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DENA S. BYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-cv-1174-DFH-JMS |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Dena Byers seeks judicial review of a final decision by the Commissioner of Social Security denying her application for disability insurance benefits. Acting for the Commissioner after an earlier district court remand, Administrative Law Judge ("ALJ") Albert J. Velasquez determined that Ms. Byers was not disabled under the Social Security Act. She could no longer perform her own past relevant work, but the ALJ found that, despite her serious spinal and psychological problems, she retained the residual functional capacity to perform light unskilled work. Ms. Byers contends that the ALJ erred by failing to articulate adequately his assessment of her residual functional capacity and credibility and by ignoring a line of evidence supporting a finding of disability.[1]

---

[1]Ms. Byers also argues that she was denied due process and that the ALJ erred by evaluating her ability to perform Light level jobs instead of Sedentary level jobs. The court will not address these arguments because reversal is required on
(continued...)

The court finds that the ALJ failed to explain adequately his finding regarding Ms. Byers' residual functional capacity and credibility.  The usual remedy in such cases is a remand, but the Commissioner and ALJ have already had one opportunity to support the critical finding after the earlier remand.  Ms. Byers has shown enough to put the burden on the Commissioner to show that she was not disabled, and the Commissioner has now failed twice to do so.  A second  remand for further proceedings is not needed.  The court reverses the ALJ's decision and directs the payment of disability insurance benefits.

## Background

Dena Byers worked consistently from 1989 to 2001 as a clerk, dental assistant, and chiropractic assistant.  R. 544.  She has not worked since September 2001 (except for three days as a juror in 2005).  *Id.*  Ms. Byers applied for disability insurance benefits on June 4, 2002.  R. 31.  She claimed disability due to degenerative disc disease causing frequent disc herniations and nerve impingements, fibromyalgia, and myofascial pain.  R. 43.  The ALJ denied Ms Byers' claims on August 27, 2004.  R. 15-21.  The appeals council denied her request for review on April 15, 2005.  R. 6.

Ms. Byers sought review in federal court.  Judge Tinder remanded, finding that the ALJ (1) failed to discuss the applicable listing, (2) erred in arbitrarily

---

[1](...continued)
other grounds.

rejecting the opinion of a treating physician, and (3) improperly weighed Ms. Byers' credibility.  R. 480, 483.  On remand, the case was again heard by ALJ Velasquez.  Because of the evolution of her medical history since her initial filing, Ms. Byers partially amended her claims to allege disability under Listings 1.04 (disorders of the spine), 12.04 (depression), and 12.06 (anxiety with panic attacks).  R. 446.  The ALJ denied Ms. Byers' claims on September 28, 2007.  R. 456.  The appeals council denied request for review on July 16, 2008.  R. 377.  Ms. Byers now seeks judicial review of this second administrative denial.

I.      *Medical Record*

Ms. Byers has degenerative disc disease, which has required three surgeries, plus two branch block injections and a radiofrequency facet neurotomy.

In 1985, Ms. Byers was diagnosed with degenerative disc disease and underwent a microdiscectomy on two lumbar discs.  R. 144, 224.  In August 2001, she underwent another microdiscectomy to relieve nerve pressure that was causing leg pain.  R. 224.  A January 2002 MRI revealed no recurrence of disc herniation.  R. 189.  After an August 2002 examination, Dr. Elpidio Feliciano wrote that she had slanted posture and used a cane occasionally.  When she did not require a cane, she could walk for 10 to 15 minutes.  R. 196.  In September 2002, Dr. Larry Blankenship reported that she continued to experience leg and hip pain and left foot numbness, writing that she "can't put pressure on leg" and

"things have progressively gotten worse."  R. 144.  Dr. Blankenship then performed a lumbar myelogram and reported that the "myelogram reveals recurrent *large* disc" and the "epidural mass obliterates L4-5 neuroframen [with] compression of L4 exiting nerve root."  R. 140 (emphasis in original).  In October 2002, Dr. Michael Burt operated, removing a portion of the L5 lamina and a "bulging disc."  R. 138-39.

In December 2002, Dr. Burt wrote that Ms. Byers had complete relief until she fell over a dog, that she was then experiencing paresthesias and back and hip pain, and that she had a positive straight leg raise test.  Dr. Burt attributed the new symptoms to muscle spasms.  R. 171.  In January 2003, Dr. Burt wrote that Ms. Byers no longer had paresthesias but still had left hip pain.  R. 170.

In April 2003, Ms. Byers reported to a physical therapist that her pain would increase after 20 minutes of standing or 30 minutes of sitting, and that it would decrease when she would lie down with her legs up, use pain medication, and/or use ice or heat.  She reported being unable to bathe without help or to sleep through the night.  R. 270.  The therapist wrote that her compliance with therapy was poor, with several no-shows and cancellations.  R. 270, R. 276.

In March 2003, Ms. Byers' family physician, Dr. Loveless, diagnosed fibromyalgia.  Ms. Byers reported constant pain, depression, and sleeplessness. R. 266.  In May 2003, for the purpose of Ms. Byers' Social Security claim, Dr.

Loveless wrote that she had less than sedentary level capacity, that she could sit, stand, or walk for 30 minutes at a time each, and that she could sit for three hours in an eight-hour workday.  R. 256.  In June 2003, Ms. Byers reported that her pain medicine was not working and that she could hardly move.  R. 264.  A June 2003 x-ray revealed narrowing of the C5-6 disc space, no evidence of acute osseous injury, and straightening of the cervical spine.  R. 281.

In June 2003, Ms. Byers reported to MedCheck, an emergency care service, after falling at a yard sale.  Dr. Armand Gallanosa wrote that she had severe lower back pain radiating to her left leg.  R. 277-80.  In September 2003, Ms. Byers reported back pain and left leg numbness, with help from Celebrex.  R. 295.  In September and November 2003, Dr. Loveless wrote that Ms. Byers was "unimproved," had a "poor" prognosis, and would not be able to resume work for over 24 months.  R. 267, 164.

In August 2004, Ms. Byers visited Dr. Loveless and reported back and leg pain.  Ms. Byers reported that the pain had improved after surgery but now felt as it had prior to surgery.  R. 639.  She reported that she required a cane to walk due to numbness and weakness in her left leg.  *Id*.  In December 2004, Ms. Byers reported an inability to sleep and the same leg symptoms and ambulatory difficulties.  Examination revealed spinal tenderness and a positive straight leg raise test.  R. 651-52.  In January 2005, Ms. Byers reported "so much pain" with no relief from medication.  R. 658.

A January 2005 MRI by Dr. Roger Brockman revealed epidural fibrosis, disc bulging at L4-5 producing mild to moderate L4-5 stenosis (compression of the spinal cord), disc bulging at L5-S1 with moderate stenosis, disc extrusion at T2-L1, and degenerative disc disease at L4-5, L5-S1, and T2-L1.  R. 586-87.

In February 2005, Dr. Burt and Dr. John Swofford performed a lumbar epidural steroid injection on Ms. Byers.  They diagnosed left leg pain, lower back pain, and lumbar radiculopathy.  R. 659-60.  Ms. Byers reported side effects from the injection.  She also reported severe neck pain, traveling to her left shoulder and down her arm to the fingers, with left arm weakness.  Examination by Dr. Loveless  revealed tenderness across the cervical spine, and a "grimace [with] pain [with] flexion and extension" of the neck.  Dr. Loveless wrote that Ms. Byers "has had [the neck and shoulder pain] for years."  R. 661-62.  Later in February, Ms. Byers  reported "bad" lower back pain with no relief from medication.  R. 663.

On March 4, 2005, Dr. Swofford performed a procedure to inject bilateral L4-5 and L5-S1 lumbar facet medial branch blocks.  Dr. Swofford wrote that Ms. Byers had obtained very little relief from the February 2005 epidural injection, and that Ms. Byers had a history of fibromyalgia.   He reported that Ms. Byers experienced "good pain relief " from the procedure.  R. 666-67.  On March 22nd, Dr. Swofford again injected branch blocks and reported that the first set "significantly altered her back pain with significant reduction."  R. 669.  On March 27th, Dr. Swofford performed a radiofrequency facet neurotomy.  Regarding the

two branch block injections, Dr. Swofford wrote:  "Pre-block, the patient rated her pain at 5/10.  Post-block, she rates it at 0/10."  R. 671-72.

Despite these positive short-term results, in May 2005 Ms. Byers visited Dr. Loveless and reported worsening back pain, blurred vision, and fatigue.  She reported that if she tried to do anything physical, she would be down for weeks at a time.  Dr. Loveless noted that she was on muscle relaxers and ultracet (pain medication) "[with]out much relief."  Dr. Loveless diagnosed Ms. Byers with diabetes mellitus and prescribed  medication and diet.  R. 683-84.

In August 2005, Ms. Byers visited Dr. Loveless, reporting that the neurotomy had helped with radicular pain but was not helpful for the pain in her back.  She was taking Lortab "to get through the day" and was not sleeping well.  Dr. Loveless prescribed duragesic patches and referred Ms. Byers to a pain clinic.  R. 701.  In September 2005, Ms. Byers reported that the duragesic patches were not strong enough to provide relief.  Dr. Loveless prescribed a higher strength patch.  R. 706.

In October 2005, Dr. Loveless wrote that Ms. Byers experienced arthralgia, arm and foot numbness, paresthesia, and depression.  R. 724.  In December 2005, Dr. Amy Liu, a pain specialist, further increased the strength of the duragesic patches.  Ms. Byers reported that her medicine provided 80% relief of symptoms, with constant pain in the neck and shoulder.  Dr. Liu assessed that

the pain was myofascial, with "significant improvement in every aspect."  R. 843.

In January 2006, Ms. Byers reported panic attacks, vomiting acid, and being up at night "wringing hands."  R. 745.  Dr. Andrew Marciniak, a pathologist, diagnosed mild gastritis.  R. 747.  In February 2006, Ms. Byers reported further anxiety to Dr. Loveless, and saw Dr. Lori Urban, a psychiatrist.  In her formal clinical summary, Dr. Urban wrote that Ms. Byers had depressed mood, flat affect, poor appetite, poor sleep, and a history of panic attacks, but reported positive appearance, judgment, attitude, and thought processes.  R. 845-47.  Also in the formal summary, Dr. Urban wrote that Ms. Byers "enjoys reading and flower arranging, but has had to decrease more of her active interests, such as water skiing and boating."  R. 845.  In her handwritten notes, Dr. Urban wrote:  "used to water ski, [down arrow] boating."  R. 848.  That same day, Ms. Byers visited a physical therapy center affiliated with Dr. Urban.  A therapist's evaluation reads:  "Leisure Activities:  Current:  church activities, play cards, rent movies.  Past: outdoor tasks, [water]skiing, boating, roller skat[ing], sled riding . . . . Functional Mobility:  30 mins. sitting, 10-15 mins. standing, 15 min. walking . . . ."  R. 849-50.  Later in February, Dr. Loveless wrote that Ms. Byers suffered continuing panic attacks and anxiety, with a possible need to return to the emergency room.  She also wrote that Ms. Byers had tearfulness, moodiness, insomnia, social withdrawal, and symptoms consistent with depression, and that her compliance with treatment was good.  Dr. Loveless diagnosed Ms. Byers with a hiatal hernia and prescribed Effexor for depression, which Ms. Byers found helpful.  R. 753-57.

In March 2006, Ms. Byers visited Dr. Loveless after falling down stairs.  Ms. Byers reported back and left hand pain, hand and leg numbness, and unsteady gait.  R. 758-61.  Also in March, Ms. Byers was dismissed from physical therapy for failure to set up appointments.  Dr. Loveless wrote that this failure was "due to waiting to see about surgery for hernia."  R. 764-66.

In May 2006, Ms. Byers reported nausea, itching, oral numbness, and slurred speech.  Both Ms. Byers and Dr. Loveless attributed these symptoms to the side effects of Zonegran, an anti-seizure medication that Dr. Liu prescribed for pain in March 2006.  R. 771.  Later in May, Dr. Loveless assessed diabetes, degenerative joint disease, and anxiety.  Ms. Byers reported falling down the basement stairs and falling asleep at the sink.  She also reported continued panic attacks, with some relief from Effexor.  R. 775, 778.

In July 2006, Ms. Byers visited Procare, another physical therapy center.  In her initial evaluation, the therapist wrote:

> numbness and tingling is much better but her pain persists . . . . 8 [out of] 10 at worst with use during the day . . . . horrible swelling when she wakes up in the morning . . . . ADL's [activities of daily living] are affected in that she cannot lift pitchers or pick up glasses.  She has trouble getting out of the tub.  She c/o [complains of] dropping items . . . . poor participation in homemaking.

R. 863-64.  Procare's progress notes show five scheduled appointments in July and August, four of which were no-shows or cancellations.  The notes indicate

that Ms. Byers' other medical problems interfered with the ability to attend therapy.  R. 872-73.

In August 2006, Ms. Byers reported that "the [pain] patches help tremendously" and that "leg pain and numbness has improved."  Dr. Loveless reported normal blood sugar and fair compliance with diet.  R. 802.

In September 2006, Ms. Byers visited Dr. Jason Gray, reporting a painful, swollen right foot.  She reported it had been this way "for the past 3 months since she fell off a ladder" and that it was getting worse.  She reported that she had just fallen down a flight of stairs before she came in and that she was very shaky and could not use her right arm very well.  Dr. Gray observed that she had a cut on her head and that her right arm was very swollen.  Dr. Gray "advised her on going to the ER but she want[ed] to be seen."  R. 874.  That evening, Ms. Byers went to the emergency room per Dr. Gray's advice.   The nurse wrote "fell down 6-7 concrete steps . . . . 1.  traumatic head injury 2. [right] hand injury."  Ms. Byers received pain medication and a scan of her head and hand, revealing no injury.  R. 616-24.

Ms. Byers visited Dr. Loveless in November 2006 for left knee pain.  Dr. Loveless wrote:  "severe pain.  has been in tears . . . . has chronic neuropathy. has fallen 3 times and has been unstable."  She further wrote that Ms. Byers was

limping and experienced weakness, depression, anxiety, painful urination, and decreased back mobility.  R. 828-30.

Also in November 2006, again for the purpose of Ms. Byers' Social Security claim, Dr. Loveless completed a Physical Capacities Evaluation.  Dr. Loveless indicated that Ms. Byers:  (1) could sit for one hour at one time and for three hours out of an eight-hour workday; (2) could stand or walk for zero hours at one time and for zero hours out of an eight-hour workday; (3) could lift or carry up to five pounds "occasionally," but never any heavier weight; (4) could perform simple grasping but no fine manipulation or use of arm controls; and (5) could "occasionally" reach and balance but never bend, squat, crawl, climb, stoop, kneel, or crouch.  Dr. Loveless wrote that Ms. Byers "is incapable of performing routine duties of any light duty job."  R. 840-41.

Throughout 2006, Ms. Byers complained of various intestinal problems, particularly esophageal pain, recurrent nausea, and constipation.  In February, Dr. Loveless instructed Ms. Byers to go to the emergency room after she reported increased vomiting.  R. 753.  In March, Ms. Byers again went to the emergency room, this time with a bowel impaction.  She reported that the doctors there told her the symptoms may be caused by her medication.  R. 765.  She reported epigastric pain in July and August.  R. 793, 804.

II.    *Testimony at the Hearing*

After the remand by Judge Tinder, the ALJ held hearings on Ms. Byers' claims on January 5 and April 25, 2007. The first witness was Dr. Arthur Lorber, who testified as a medical expert that Ms. Byers did not meet Listing 1.04A (disorders of the spine) but rendered no opinion on Listings 12.04 and 12.06, which address mental disorders. R. 932. As a basis for his conclusion, Dr. Lorber provided a brief summary of the above medical history. R. 932-42. Dr. Lorber called into question elements of Ms. Byers' October 2002 operation, particularly Dr. Blankenship's findings prior to the surgery and Dr. Burt's findings afterward. R. 933-34. He testified that Dr. Loveless erred by failing to order sufficient MRI analysis in January 2005 and that this failure cast doubt on the MRI findings. R. 936.

Dr. Lorber gave his opinion of Ms. Byers' residual functional capacity: she could lift 20 pounds occasionally and 10 pounds frequently, she could stand and/or walk for two hours per day for 30 minutes at a time, she could sit for six hours per day for 30 minutes at a time, and she could occasionally bend, stoop, and crouch but could not kneel or crawl. R. 963.

Ms. Byers' counsel cross-examined Dr. Lorber and asked why his assessment differed so greatly from Dr. Loveless' November 2006 assessment. The ALJ would not permit Dr. Lorber to answer. R. 963-64. When counsel asked Dr. Lorber for the basis of his assessment of Ms. Byers' residual functional capacity,

Dr. Lorber listed her spinal procedures, lack of outstanding neurological deficits, "history of reported babysitting," three days of jury duty, and "a fall off some stairs or off a ladder" as bases.  Counsel asked, "are you making an inference that because she can do some limited daily activities she could sustain full-time employment?"  Dr. Lorber responded that he coupled those bases "with the other findings in the records" to arrive at his assessment.  When asked by counsel what those other findings were, the ALJ interrupted and stated:  "I'm not going to ask him to respond to that."  Counsel then ended cross-examination.  R. 964-66.[2]

Ms. Byers testified next.  In response to Dr. Lorber's testimony, she testified that she had never been on a ladder and that she did not babysit, but that her 11-year-old niece visited every once in a while.  R. 966-68.  Ms. Byers testified that she had lower back pain, which traveled down her left leg to her left foot and occasionally manifested in the right leg as well.  R. 981.  She testified that her left foot and toes were numb and that she had no strength in her left foot or reflexes in her left leg.  R. 975, 984-85.  She testified that her October 2002 surgery did not relieve this nerve pain.  R. 977.  Ms. Byers testified that she had pain in her shoulders, arms, hands, legs, feet, neck, and upper and lower back.  She testified that her right leg hurt with use, but her left leg and both feet hurt at all times.  R. 988-89.  She testified that the pain in her back was constant and throughout, normally between six and seven on a scale of zero to ten, and eight or nine at its

---

[2]The court does not address the propriety of the ALJ's actions here because Ms. Byers has not raised the specific point.

worst.  R. 989.  She testified that doing "too much" made the pain worse and could render her incapacitated for several days.  R. 989-90.  She testified that she had trouble sleeping due to pain and that she had to get up and move around at night.  R. 978.  She testified that she often fell asleep on the toilet during the day as a result.  R. 990.

Ms. Byers testified that she had limitations before she stopped working:  she could sit for fifteen to twenty minutes at a time, stand for two hours in an eight-hour workday, walk half a block before she had to stop, and lift no more than five pounds.  R. 971-72.  She testified that she already had fibromyalgia and that she had received three epidurals in her cervical spine.  R. 977.  She testified that she had to lift ten pound objects as part of her job but suffered as a result.  R. 976-77. She testified that after falling down stairs, she stopped working and never resumed.  R. 971.  She testified that her condition had progressively worsened and that she agreed with Dr. Loveless' November 2006 evaluation.  R. 973.

Ms. Byers testified that she could perform light housework tasks, and she received assistance with household chores from her husband and a friend.  R. 987-88.  She testified that she could dust, sweep, and do "light cooking" (use a microwave or crock pot), but had to take rest breaks every 15 to 30 minutes to lie down on a wedge and elevate her feet.  R. 986-87.  She testified that she could take clothes in and out of the washer and dryer but could not carry a laundry basket.  R. 988.  She testified that she could not mop, vacuum, or make the bed.

R. 986-87.  She testified that her husband helped her bathe when the pain was bad.  R. 990.  She testified that she could climb stairs, but avoided doing so when possible because of her history of falling.  R. 988.  She testified that her left leg condition had caused her to fall many times.  R. 975.  She testified that she used a cane often and a walker occasionally.  R. 983.

Ms. Byers testified that she suffered severe panic attacks, marked by sweating and an inability to breathe.  R. 994.  She testified that in one instance, she called an ambulance because she was vomiting bile and thought she was having a heart attack, and that when the paramedics arrived she had passed out on the toilet.  She testified that when she had the attacks, she became very frightened, her heart raced, and she shook and cried.  R. 969-70.  She testified that there were times when she could not leave the house for two to three weeks at a time due to anxiety.  R. 985.

Ms. Byers testified that her medications were Pronethazine (nausea), Lyrica (nerve pain), Alprazolam (anxiety), magnesium citrate (laxative), Tizanidine (muscle spasms), Nexium (gastroesophageal reflux disease), and duragesic patches (pain).  R. 977-80.

Ms. Byers testified that the drowsiness caused by the medications prevented her from driving.  R. 995.  She testified that her medications also have caused bowel problems, which resulted in several trips to the emergency room.  R. 970.

She testified that the steroid injections of early 2005 caused strong side effects, including a menstrual period lasting five months and swelling lasting over a year. R. 991-92. She testified that the swelling occurred in her feet, ankles, hands, and face, and that her face swelled to "probably three times its size." *Id.* She testified that she had gone to physical therapy several times but that it sometimes caused pain and the therapists made her do things beyond her capacity. R. 992-93.

Vocational expert Ray Burger testified at the hearing. The ALJ questioned Mr. Burger about a hypothetical individual of claimant's age, education, and work experience who would be able to lift and carry 20 pounds occasionally and 10 pounds frequently, able to stand and walk for two of eight hours in an eight hour day, and able to sit for about six of eight hours in an eight hour day. The ALJ further required that the individual not climb stairs or ramps more than occasionally and that she be allowed to alternate between sitting and standing positions every 30 minutes. Mr. Burger testified that this hypothetical individual could work as a cashier, office clerk, or hand packer. R. 998. Mr. Mulvaney then posed a different hypothetical person with physical capabilities consistent with Dr. Loveless' November 2006 evaluation. R. 999. Mr. Burger testified that such a person would have no work available to her. R. 1000.

III.  *Framework for Determining Disability and the Standard of Review*

To be eligible for the disability insurance benefits she seeks, Ms. Byers must establish that she suffered from a disability within the meaning of the Social Security Act.  To prove disability under the Act, the claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that could be expected to result in death, or that has lasted or could be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  Ms. Byers was disabled only if her impairments were of such severity that she was unable to perform work that she had previously done and if, based on her age, education, and work experience, she also could not engage in any other kind of substantial work existing in the national economy, regardless of whether such work was actually available to her in the immediate area or whether she would be hired if she applied for work.  42 U.S.C. § 423(d)(2)(A).

This standard is a stringent one.  The Act does not contemplate degrees of disability or allow for an award based on partial disability.  *Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985).  Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful.

A five-step inquiry set forth in 20 C.F.R. § 404.1520 is used to determine disability status.  The steps are as follows:

(1)     Has the claimant engaged in substantial gainful activity?  If so, she was not disabled.

(2)     If not, did the claimant have an impairment or combination of impairments that were severe?  If not, she was not disabled.

(3)     If so, did the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If so, the claimant was disabled.

(4)     If not, could the claimant do her past relevant work?  If so, she was not disabled.

(5)     If not, could the claimant perform other work given her residual functional capacity, age, education, and experience?  If so, then she was not disabled.  If not, she was disabled.

See generally 20 C.F.R. § 404.1520.  When applying this test, the burden of proof is on the claimant for the first four steps and on the Commissioner for the fifth step.  *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).

At step one, the ALJ found that Ms. Byers had not engaged in substantial gainful activity since September 5, 2001, her last day of employment as a chiropractic assistant.  R. 445.  At step two, the ALJ concluded that Ms. Byers had severe impairments of back disorders, depressive disorder, and anxiety disorder.  *Id.*  He concluded that Ms. Byers' diabetes, fibromyalgia, chronic pain syndrome, and carpal tunnel syndrome either were not genuine or were not severe within the meaning of the Social Security Act.  R. 445-46.

At step three, the ALJ found that none of Ms. Byers' impairments met or equaled a listing.  R. 446.  He wrote that Ms. Byers' spinal problems did not meet

the level of severity required by Listing 1.04.  *Id.*  He assessed her radiculopathy and leg nerve pain under Listing 1.02 and found that the listing's requirements of "inability to ambulate effectively [were] not true of this claimant."  *Id.*  The ALJ concluded that Ms. Byers' mental impairments, considered singly and in combination, did not meet Listings 12.04 or 12.06.  *Id.*

At step four, the ALJ concluded that Ms. Byers could not perform her past relevant work.  The ALJ found that she had the capacity to do light work as defined in 20 C.F.R. § 404.1567(b), with the following additional limitations:  she could not lift and carry more than 20 pounds occasionally or 10 pounds frequently, she could sit, stand, and walk for six of eight hours with an option to alternate between sitting and standing positions every thirty minutes, she could only occasionally engage in postural activities such as climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, she could never climb ladders, ropes, or scaffolds, she could not work around unprotected heights or dangerous machinery, and she would be limited to simple, repetitive tasks.  R. 447.  With that residual functional capacity, the ALJ found at step four that Ms. Byers could no longer do her prior relevant work.  R. 454.  Those conclusions at the first four steps meant that Ms. Byers qualified for disability insurance benefits unless the Commissioner could show at the fifth step that she could perform other work given her residual functional capacity, age, education, and experience.  See *Zurawski v. Halter*, 245 F.3d at 886.

At step five, the ALJ determined that Ms. Byers retained the residual functional capacity to perform light unskilled work.   R. 447.   Based on the residual functional capacity for the full range of light work, and considering Ms. Byers' age, education, and work experience, the ALJ concluded that a finding of "not disabled" was directed by the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2.   R. 455-56.   The ALJ therefore denied benefits.

The Social Security Act provides for judicial review of the Commissioner's denial of benefits.   42 U.S.C. § 405(g).   Because the Appeals Council denied further review of the ALJ's findings, the ALJ's findings are treated as the final decision of the Commissioner.   *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000); *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994).   If the Commissioner's decision is both supported by substantial evidence and based on the proper legal criteria, it must be upheld by a reviewing court.   See 42 U.S.C. § 405(g); *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005), citing *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering

the facts or the credibility of the witnesses.  *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of the conflict.  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).  The ALJ's decision must be based upon consideration of all the relevant evidence, and the ALJ must articulate at some minimal level his analysis of the evidence so that the court can trace adequately the path of the ALJ's reasoning.  *Diaz*, 55 F.3d at 307-08.  The ALJ "must build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

IV.  *Residual Functional Capacity*

Ms. Byers argues that the ALJ erred by ignoring or misstating evidence that conflicted with his finding that she was not disabled.  On this record, the court agrees.  Ultimately, the ALJ is charged with making the determination of disability.  See 20 C.F.R. § 404.1527(e)(1).  Here, the ALJ considered but discounted the opinion of Dr. Loveless, Ms. Byers' family physician, that Ms. Byers was disabled and incapable of performing any light duty job.  R. 453, 841.  By mentioning nothing more than Dr. Loveless' "finding of disability," the ALJ ignored

the doctor's other findings and her supporting data.  Dr. Loveless completed a detailed assessment of Ms. Byers' condition, noting difficulties sitting, standing, walking, lifting, bending, squatting, crawling, climbing, stooping, kneeling, and crouching.  R. 840-41.  Further, by way of supporting evidence, the record includes Dr. Loveless' extensive medical records on Ms. Byers over two and a half years.  R. 627-841.  These records include notes, observations, assessments, diagnoses, prescriptions, test results, communications with specialists, specialist reports, and other medical analysis.

In making a disability determination, an ALJ should give more weight to treating doctors who are "most able to provide a detailed, longitudinal picture [and who] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ."  20 C.F.R. § 404.1527(d)(2).  In his disability analysis, the ALJ never mentioned any of Dr. Loveless' specific opinions, findings, or supporting facts.  See R. 452-54.  Rather, the ALJ only stated that Dr. Loveless "simply opine[d] that [Ms. Byers] is disabled based on her general physical examinations."  R. 452-54.  There is no evidence that Dr. Loveless based her opinion exclusively on her own examinations.  Her records contain ample data from outside specialists, including independent opinions and test results.  See R. 627-841.  Though the ALJ need not give a treating physician's findings controlling weight, he must at least address them.  See *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001) (holding that the ALJ erred by failing to consider a psychiatrists'

"records and opinions" regarding claimant's back pain).  Although an ALJ is not required "to address every piece of evidence or testimony in the record," *Zurawski*, 245 F.3d at 889, the ALJ "may not ignore an entire line of evidence that is contrary to her findings." *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). The ALJ's failure to address the findings of a longtime treating physician is both contrary to Administration guidelines and reversible error.    20 C.F.R. § 404.1527(d)(1)-(2); *Zurawski*, 245 F.3d at 889.

The ALJ found that Ms. Byers was capable of (1) lifting and carrying 20 pounds occasionally and 10 pounds frequently, (2) standing and walking for two hours in an eight hour day, and (3) sitting for six hours in an eight hour day.  R. 447.  Relying on the vocational expert's testimony that a significant number of jobs existed in the national economy for a hypothetical person with this residual functional capacity, the ALJ found that Ms. Byers was not disabled.  R. 998, 447, 455-56.  However, given Dr. Loveless' opinion and the lack of contradicting evidence in the record, the ALJ's assessment is not supported by substantial evidence.

The medical evidence in the record tells the consistent story that Ms. Byers continued to suffer significantly despite achieving short-term relief from her many operations.  The ALJ's conclusion that this medical evidence was both "widely disparate" and not reflective of disability is simply contrary to the record.  See R. 453.  The ALJ's analysis suffers from the same selective approach to the evidence

and mis-statement of the record found by Judge Tinder when he remanded the ALJ's first opinion in this case.  See *Byers v. Barnhart*, No. 05-cv-836, slip op. at 5-6 (S.D. Ind. July 21, 2006); R. 485-86.  Accordingly, the ALJ has failed to "build an accurate and logical bridge from the evidence to his conclusion," and his decision cannot be affirmed.  *Clifford*, 227 F.3d at 872.

V.     *Credibility*

Ms. Byers further argues that substantial evidence fails to support the ALJ's credibility assessment.  A claimant's subjective complaints must pass a two-step test to support a finding of disability.  First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms the claimant alleges.  20 C.F.R. §404.1529(a)-(b).  Second, the ALJ must consider the intensity and persistence of the alleged symptoms.  The ALJ considers the claimant's subjective complaints in light of the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)     The claimant's daily activities;

(2)     Location, duration, frequency, and intensity of pain or other symptoms;

(3)     Precipitating and aggravating factors;

(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)     Treatment, other than medication, for relief of pain or other symptoms;

(6)     Other measures taken to relieve pain or other symptoms;

(7)     Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Credibility determinations are normally entitled to deference and will not be overturned unless they are "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990).  However, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations," such as a claimant's demeanor or other intangibles, a reviewing court has greater freedom to review the ALJ's decision.  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994) (overturning ALJ's credibility determination that rested on inconsistencies in the record).

The ALJ found that Ms. Byers' statements about her condition were not credible.  R. 454.  To support this conclusion, the ALJ pointed out that Ms. Byers engaged in church activities, played cards, read, arranged flowers, socialized, and once attended a yard sale.  None of these activities are strenuous or prolonged in nature, and Ms. Byers' ability to engage in them does not establish or even suggest that she was capable of physical activity equivalent to full-time work.  See *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (ALJ "failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days a

week"); see also *Byers v. Barnhart*, No. 05-cv-836, slip op. at 7 (S.D. Ind. Jul. 21, 2006); R. 487.  Moreover, Ms. Byers testified that she could not sit through church service without having to get up, R. 350, and her attendance at the yard sale resulted in a fall that sent her to the emergency room.  R. 277-80.

The ALJ also points out that Ms. Byers "did not require a TENS unit or radiofrequency ablation," but it is unclear what support there is for this assertion or what relevance this has to Ms. Byers' condition.  The ALJ deemed Ms. Byers' persistent smoking habit and "fair" compliance with diabetes treatment as indicating poor credibility.  R. 454.  These factors have no bearing on credibility and have almost nothing to do with the health conditions at issue here.  These facts are irrelevant without further evidence that Ms. Byers could return to work if she quit smoking or had better compliance with her diet.  See *Rousey v. Heckler*, 771 F.2d 1065, 1069-70 (7th Cir. 1985) (holding that claimant's failure to follow doctor's advice to quit smoking was improper grounds for denial because there was no evidence that doing so would allow claimant to return to work).

The ALJ's remaining rationale for discounting Ms. Byers' testimony does not accurately reflect the record evidence.  The record does not support the ALJ's statement that Ms. Byers "had to 'cut back'" on activities such as waterskiing.  The record clearly reflects that she simply was no longer able to participate in such activities due to her condition.  See R. 848-49.  The ALJ stated that Dr. Haller's report suggests "decreased effort" in an attempt to fabricate symptoms,

but in actuality the report strongly supports a finding of disability and expresses no doubt about the genuineness of Ms. Byers' pain. R. 918-22. The ALJ stated that Ms. Byers' medications were "not shown to be ineffective," while nearly all of the medical evidence in the record supports the opposite conclusion. The ALJ finds "no indication she was unable to accomplish her physical therapy," but the record shows that her other conditions interfered with successful physical therapy. R. 873-74, 919. Contrary to the ALJ's findings, the record neither undermines Ms. Byers' credibility nor supports a finding that she was capable of maintaining full-time employment. The ALJ's credibility determination simply is not supported by substantial evidence and cannot be affirmed.

## VI.   *Remedy*

The court has the authority to enter a judgment affirming, modifying, or reversing the Commissioner with or without remanding the case for rehearing. 42 U.S.C. § 405(g). When an ALJ's decision is not supported by substantial evidence, a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits. See *Campbell v. Shalala,* 988 F.2d 741, 744 (7th Cir. 1993). An award of benefits "is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Briscoe v. Barnhart*, 425 F.3d 345, 356 (7th Cir. 2005). If eligibility depends on contested factual issues, then a remand for further proceedings is necessary. See *id.* at 356-57.

In *Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998), the Seventh Circuit addressed the claim of Rosie Wilder for the second time, having remanded an administrative denial three years prior.  The court awarded benefits because of "the obduracy evidenced by the [Administration] on remand."  *Id.* at 804.  The court found that the second denial had "no reasoned basis," contained factual inaccuracies, and ignored the instructions of the previous remand order.  *Id.* at 802-04.  The court determined that this obduracy called for an award of benefits "to bring the charade to an end."  *Id.* at 801.

In interpreting *Wilder*, the court in *Briscoe v. Barnhart*, 425 F.3d 345 (7th Cir. 2005), clarified that obduracy alone does not trigger a benefit award.  The *Briscoe* court explained that an award was appropriate in *Wilder* because the Administration had twice denied benefits without reasonable grounds and in the face of uncontradicted medical evidence supporting the claimant.  *Id.* at 356.  By contrast, where a claimant has failed to provide sufficient evidence to meet her burden under 20 C.F.R. § 404.1520, the Administration's obduracy alone is not enough to warrant a judicial award of benefits.  *Briscoe*, 425 F.3d at 356.  In such cases, remand is necessary to allow the claimant to provide evidence to substantiate her claim.  *Id.* at 357.

This case is closer to *Wilder*. The ALJ here again supported his conclusions with a selective and mistaken view of the record evidence, resulting in a second denial that was "no more reasoned than the first one."  See *Wilder*, 153 F.3d at

802.  Like the *Wilder* claimant, and unlike the *Briscoe* claimant, Ms. Byers has twice supported her claim with sufficient medical and lay evidence that remains virtually uncontradicted.

Virtually uncontradicted does not mean there is no contradictory evidence, but there is no substantial contradictory evidence here.  Ms. Byers' medical evidence is contradicted only by the testimony of Dr. Lorber.  As noted above, Dr. Lorber never examined Ms. Byers, and his opinion is unsupported by the record. This one contradictory opinion, even from a medical expert, does not provide substantial evidence that could carry the Commissioner's burden at step five of the disability analysis and justify a denial of benefits.  See *Micus v. Bowen,* 979 F.2d 602, 607-09 (7th Cir. 1992) (ordering payment of benefits where the ALJ erroneously rejected a treating physician's opinion that was supported by substantial evidence, and relied instead on the "speculative statement" of a consulting physician); *Woody v. Secretary of Health & Human Services,* 859 F.2d 1156, 1161-63 (3d Cir. 1988) (ordering payment of benefits after eight years of proceedings where ALJ's denial of benefits was inconsistent with reports from the claimant's treating physicians and otherwise not supported by substantial evidence); *Parker v. Astrue*, 2008 WL 4298175, at *8-*10 (S.D. Ind. Sept. 17, 2008) (awarding benefits because the one piece of contrary evidence, the testimony of a non-treating physician, was against the "clinical evidence taken as whole").

As the Commissioner concedes, Ms. Byers has twice met her burden of proving her prima facie case, shifting the burden to the Commissioner at step five. See 20 C.F.R. § 404.1560(c)(2); *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001).  The Commissioner has now failed twice to meet this burden and has failed to support its determinations on residual functional capacity and credibility with substantial evidence.  Where as here the claimant has twice established a prima facie case of entitlement, the record has been fully developed, and the Commissioner has failed to find substantial evidence supporting denial of benefits, there is no reason to remand for further finding of fact.  *Allen v. Bowen*, 881 F.2d 37, 44 (3d Cir. 1989) (ordering award of benefits where vocational testimony needed to justify denial of benefits failed to carry Commissioner's burden of proof at step five; Commissioner was not entitled to second chance); *Parker v. Astrue*, 2008 WL 4298175, at *1 (S.D. Ind. Sept. 17, 2008) (ordering an award of benefits where the ALJ's finding at step five was supported "only by supposition and not by substantial evidence"); *Rohan v. Barnhart*, 306 F. Supp. 2d 756, 771-72 (S.D. Ill. 2004) (ordering an award of benefits where Commissioner had failed to carry burden of proof at step five over three separate hearings over eleven years).

Another remand would unconscionably delay the resolution of Ms. Byers' claim.  A court may award benefits where "the delay involved in repeated remands has become unconscionable."  *Seavey v. Barnhart*, 276 F.3d 1, 13 (1st Cir. 2001), citing *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  Ms. Byers' claim remains unresolved after seven years, two hearings before an ALJ, two petitions

to the Appeals Council, and a previous appeal to the district court.  A remand for a third evaluation of this claim would likely delay resolution for over a year, as the ALJ would have to review the 1,000 page record and conduct yet another hearing. As in the cited cases, the Commissioner is not entitled to another chance to support the findings at step five.

On this record, another remand would only postpone Ms. Byers' ultimate receipt of benefits.  "Where further administrative proceedings would simply prolong [a claimant's] waiting and delay [her] ultimate receipt of benefits, reversal is especially appropriate." *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982); *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).  Since the Commissioner has twice failed to come forward with substantial evidence to rebut Ms. Byers' prima facie case of entitlement, remand here would serve only to delay her ultimate receipt of benefits.  The Commissioner is not entitled to "endless opportunities to get it right," *Seavey*, 276 F.3d at 13, and the government may not "adjudicate a case *ad infinitum* until it correctly applies the proper legal standard and gathers evidence to support its conclusion," *Sisco v. U.S. Dept. of Health and Human Services*, 10 F.3d 739, 746 (10th Cir. 1993) (citation omitted).  The Commissioner is not entitled to a third opportunity to support its findings with substantial evidence and meet its step five burden.

*Conclusion*

For the foregoing reasons, the court reverses the ALJ's decision to deny benefits and will enter a final judgment directing the payment of disability insurance benefits to plaintiff Dena S. Byers.

So ordered.

Date: October 5, 2009

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Patrick Mulvaney
mulvaney@onet.net

Tom Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov, wadlington@usdoj.gov, lin.montigney@usdoj.gov